STATE of Missouri, Respondent,

v.

Charles HINEMAN, Appellant.

No. SC 81882.

Supreme Court of Missouri,
En Banc.

Nov. 23, 1999.

Rosemary E. Percival, Asst. Public Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Krista D. Boston, Asst. Atty. Gen., Jefferson City, for respondent.

PER CURIAM.[1]

Charles Hineman appeals his convictions for one count of assault in the first degree,

---

1. The appeal in this case was originally decided by the Court of Appeals, Western District, in an opinion written by the Honorable Robert G. Ulrich. Portions of that opinion are incorporated herein without further attribution.

section 565.050,[2] and one count of child abuse, section 568.060. He was sentenced to consecutive sentences of ten and three years imprisonment, respectively. On appeal, Hineman's sole contention is that the trial court erred in failing to submit a proposed instruction for the lesser-included offense of assault in the second degree. The judgment as to assault in the first degree is reversed, and the case is remanded. In all other respects the judgment is affirmed.

The following evidence was adduced at trial.

On February 23, 1997, Hineman and his fiancée, Ara Lansdown, were in their home with their 10–week–old son, Dakota. Hineman, Ara, and Dakota had spent the afternoon at Ara's parents' house. They returned to their home at approximately 3:00 in the afternoon. At that time, Dakota had no noticeable injuries. Hineman, Ara, and Dakota spent the rest of the day at their home. Dakota appeared to be normal. At approximately 10:30 p.m., Hineman took Dakota upstairs to put him to bed for the night.

The evidence indicated that Hineman, after putting Dakota in his crib, pulled on Dakota's leg. Subsequently, Hineman noticed that Dakota's leg was in a strange position and that it seemed "more flexible" than usual. At that point, Hineman called Ara upstairs to show her Dakota's leg. They examined the baby, and Hineman lifted the leg slightly. Dakota did not cry; therefore, Hineman and Ara assumed that nothing was wrong with Dakota.

At approximately 3:00 a.m., Ara woke to check on Dakota and discovered that Dakota's right leg was extremely swollen and sensitive. She alerted Hineman. That morning they took the baby to a hospital emergency room. Dakota was examined, and x-rays revealed that he had a fracture to the right femur approximately zero to three days old. Because the bone was completely severed at the break, the injury was described as a very displaced fracture. Experts testified at trial that such a fracture could be caused only by an extreme amount of force that could not be generated by a 10–week–old baby. The x-rays also revealed multiple older fractures. Dakota had at least one upper tibia fracture approximately seven to fourteen days old and five rib fractures approximately ten to twenty-one days old.

Hineman and Ara told hospital staff that they did not know how Dakota had been injured. They did not offer any history of trauma to the baby, but eventually related stories of several "accidents" that had occurred. Hineman informed the social worker and other hospital personnel that he had pulled on Dakota's right leg after putting him in his crib the night before. He also told the social worker that he had accidentally dropped the baby about a month before while bathing him and that there had been two incidents where the couple's large dog had jumped on Dakota when he was in his car seat or on the couch.

On February 25, 1997, the division of family services contacted Detective Dave Ross of the Kansas City police department regarding Dakota's condition. Detective Ross requested that Hineman and Ara accompany him to the police station for an interview concerning Dakota's injuries, and they complied. Upon arriving at the station, Detective Ross took Hineman into an interrogation room. He first took down Hineman's basic biographic information and then read Hineman his *Miranda* rights.

Hineman initially insisted that he did not know how Dakota could have been injured. He later told Detective Ross about the two incidents with the dog and the occasion of his having dropped Dakota when bathing him, but he maintained that he did not know at the time that Dakota had been injured. At some point, Detective Ross informed Hineman that he did

not believe him. Hineman eventually admitted that he might have caused the leg injury the night before by pulling on Dakota's leg. In his statement to the police, Hineman stated that he was aggravated with Ara's stepmother, and when he placed Dakota in his crib, he grabbed Dakota's leg and pulled it hard. Detective Ross testified that Hineman then proceeded to show him with his hands how he had used both hands to pull Dakota's leg out to the side. At trial, however, Hineman testified that he did not know how Dakota was injured, and he denied ever showing Detective Ross that he put both hands on Dakota's leg.

During trial, the state presented two experts who testified that the injuries Dakota manifested when presented at Children's Mercy Hospital were the result of multiple blows at different times and that such injuries are typically nonaccidental and associated with child abuse. Dr. Nigel Price, a pediatric orthopedic surgeon at Children's Mercy Hospital, described Dakota's femur fracture as a very displaced fracture that would require an extreme amount of force. He testified that he had never seen a more displaced fracture in the baby's age group and that such an injury could only have been created by great force administered by an adult or a catastrophic event.

Dr. Jeffrey Foster, a pediatric radiologist, also testified regarding Dakota's injuries stating that such injuries usually indicate child abuse. In his testimony, Dr. Foster explained that children's bones are more flexible than adult bones and that a child under six months could not generate enough force to cause such a fracture on his own. He noted the frequency with which he had seen femur injuries and that such injuries could be inflicted or accidental. He also noted that the medical literature concluded that such an injury is usually due to child abuse.

Hineman's parents and Ara testified on Hineman's behalf and corroborated his account of the events leading to Dakota's hospitalization. Hineman testified and denied any responsibility for Dakota's injuries, stating that the injuries were the result of a series of accidents.

At the close of all the evidence, the court denied Hineman's motion for judgment of acquittal. Defense counsel requested that the court submit an instruction on assault in the second degree to the jury. The court denied counsel's request, finding that no evidence was presented to support the proffered instruction. The jury found Hineman guilty of first-degree assault and child abuse.

■ In his sole point on appeal, Hineman contends that the trial court erred in failing to submit proposed instruction "A" for assault in the second degree, the lesser-included offense of assault in the first degree, because the evidence supported submission of the instruction and he was entitled to have the lesser-included offense submitted.

Defendant's proposed instruction "A" was as follows:

As to Count _____, if you do not find the defendant guilty of assault in the first degree as submitted in Instruction No. _____, you must consider whether he is guilty of assault in the second degree as submitted in this instruction.

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

That on or about February 23, 1997, in the County of Jackson, State of Missouri, the defendant recklessly caused serious physical injury to Dakota R. Hineman, DOB 12/11/96, by pulling on Dakota R. Hineman's right leg, causing bones in the right leg to break, then you will find the defendant guilty of Count I of assault in the second degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilt of that offense.

A person acts "recklessly" as to causing serious physical injury if he consciously disregards a substantial and unjustifiable risk that his conduct will result in serious physical injury and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. If you do find the defendant guilty under Count I of assault in the first degree, you will return a verdict finding the defendant guilty of assault in the first degree.

Instruction "A" was patterned after MAI–Cr.3d 319.12 as modified by 304.08. Hineman contends the trial court erred in refusing to submit his proffered instruction on the lesser-included offense because sufficient evidence was offered that he acted recklessly and not knowingly in harming Dakota.

■ The trial court is not obligated to give a lesser-included offense instruction unless the evidence supports acquitting the defendant of the greater offense and convicting him of the lesser offense. Section 556.046.2; *State v. Mease*, 842 S.W.2d 98, 111–12 (Mo. banc 1992), cert. denied, 508 U.S. 918, 113 S.Ct. 2363, 124 L.Ed.2d 269 (1993); *State v. Barnard*, 972 S.W.2d 462, 466 (Mo.App.1998). The defendant is not required to put on affirmative evidence as to the lack of an essential element of the higher offense. *State v. Santillan*, 948 S.W.2d 574, 576 (Mo. banc 1997). If a reasonable juror could draw inferences from the evidence presented that the defendant acted recklessly, the trial court should instruct down. *See id.* If there is any doubt concerning the evidence, the trial court should resolve any doubts in favor of instructing on a lower degree of the crime, leaving it to the jury to decide which of two or more grades of an offense, if any, the defendant is guilty. *Id.* at 577.

Various explanations were introduced into evidence as to how the victim was injured. There was testimony that Hineman pulled on the victim's leg: (1) because it was caught in a blanket; (2) because he

was angry at his fiancée's stepmother; and (3) out to the side, not hard at all. As previously noted, there was testimony that Hineman demonstrated how he had placed two hands on the leg and pulled it out to the side. There was testimony that the injury occurred when Hineman "scooted" the victim down in his crib after moving the blankets. There was testimony that Hineman did not try to hurt Dakota. There was expert testimony that injuries such as the injury in this case can be accidental. There was testimony that Hineman was loving and caring towards the child.

■ The mental state of the accused is the distinguishing factor between the two degrees of assault at issue in the instant case. Assault in the first degree requires a defendant to act knowingly. Assault in the second degree requires a defendant to act recklessly. A person acts "knowingly" or with knowledge when: (1) with respect to his conduct or to attendant circumstances, he is aware of the nature of his conduct or that those circumstances exist, or (2) with respect to a result of his conduct, he is aware that his conduct is practically certain to cause that result. *Section 562.016.3.* A person acts "recklessly" in causing serious physical injury where (1) he consciously disregards a substantial and unjustifiable risk that his conduct will result in serious physical injury, and (2) such disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation. *Section 562.016.4.*

■ The evidence previously discussed supports an instruction on assault in the second degree. Hineman's mental state can be determined only by making an inference from the evidence. The jury is permitted to draw such reasonable inferences from the evidence as the evidence will permit and may believe or disbelieve all, part, or none of the testimony of any witness. The defendant's mental state may be determined from evidence of the

defendant's conduct before the act, from the act itself, and from the defendant's subsequent conduct. *State v. Johnson,* 948 S.W.2d 161, 166 (Mo.App.1997). While it can be inferred from the nature of the injury and the other evidence that Hineman acted knowingly, the jury also could have drawn a different inference from the evidence and concluded that Hineman acted recklessly. The jury was not required to make the latter inference, but the trial court erred in refusing to submit the requested instruction on assault in the second degree.

The judgment as to the conviction and sentence for assault in the first degree is reversed, and the cause is remanded. In all other respects, the judgment is affirmed.

All concur.